IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------------------------------------  :
UCAR CARBON COMPANY, INC.,                               : CASE NO.  1:07 CV 00278
                                                         :
                              Plaintiff,                 :
                                                         : MEMORANDUM OF OPINION AND
              -vs-                                       : ORDER GRANTING DEFENDANT'S
                                                         : MOTION TO DISMISS COUNTS I & III,
TOUCHSTONE RESEARCH                                      : DENYING SUMMARY DISMISSAL OF
LABORATORY, LTD.,                                        : COUNT II, AND GRANTING
                                                         : DEFENDANT'S MOTION TO
                              Defendant.                 : TRANSFER
------------------------------------------------------  :
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS

In this patent and licensing action, plaintiff UCAR Carbon Company, Inc.

("UCAR") seeks a declaratory judgment on the validity and infringement of U.S. Patent

No. 6,849,098 ("098 Patent") assigned to Touchstone Research Laboratory, Ltd.

("Touchstone") that UCAR's activities do not infringe claims of the '098 Patent and that

the '098 Patent is invalid.  (Complaint Doc 1, Count I, hereinafter "Complaint").  UCAR

also levels claims of equitable and legal estoppel on the license to the '098 Patent,

seeking a declaration from the Court that UCAR has the right to practice the '098

Patent.  (Complaint, Counts II-III).

Now before the Court is Touchstone's motions to dismiss UCAR's complaint for

lack of declaratory judgment jurisdiction (Count I), to dismiss for failure to state a claim

(Counts II-III), and for summary judgment (Counts II-III).  (Docs. 14, 15).  Alternatively,

Touchstone has motioned to transfer this case to the District Court for the Northern

District of West Virginia pursuant to 28 U.S.C. §§ 1404(a).  (Doc. 16).  UCAR filed briefs in opposition to which Touchstone has replied.  (Doc. 26, 27, 33 ).

For the reasons set forth below, this Court will grant Touchstone's motion to dismiss Counts I and III, deny its motion to summarily dismiss Count II, and grant its alternative motion to transfer the remaining claim to the Northern District of West Virginia.

## I. BACKGROUND

This suit involves the '098 Patent issued by the U.S. Patent and Trademark Office on 1 February 2005 and assigned to Touchstone for the development of "carbonaceous foam" used in composite tooling.[1]  (Complaint, Exhibit A).  As reflected in the record, the '098 Patent was invented by Brian E. Joseph and Darren K. Rogers while in the employ of Touchstone at its single facility in Triadelphia, West Virginia.  (Doc. 18, Joseph Declaration ¶ 6, 9, hereinafter "Joseph Dec.").  The co-inventor of the '098 Patent, Mr. Rogers, separated from Touchstone in 2002 and now resides in the Oak Ridge, Tennessee area.  (Joseph Dec. ¶ 5).

Together, Mr. Joseph, the President of Touchstone since 1997, and Elizabeth Kraftician, own all of the stock in this closely held corporation which employs approximately fifty people in its Triadelphia facility.  (Joseph Dec. ¶¶ 3, 6).  Mr. Joseph

---

[1]Touchstone develops and manufactures CFOAM, a coal-based carbon-foam used in composite tooling, which involves machining carbon foam blocks into desired shapes to then be used as a mold for the manufacture of a range of parts.  Touchstone filed an application for what was to become the '098 Patent on 9 August 2001.  (Joseph Dec. ¶¶ 7, 10).

notes that Touchstone's customer base ranges from aluminum and chemical companies, to NASA, and the U.S. Department of Defense.  According to the record affidavits, Touchstone relies upon federal contracting for roughly 80% of its business. (Joseph Dec. ¶ 4).

In 2005, Craig Schuler ("Mr. Schuler"), President of GrafTech International, Ltd. ("GrafTech"), which wholly owns UCAR, unilaterally approached Touchstone to explore the possibility of either acquiring or pursuing a joint venture with Touchstone as it related to "carbonaceous foam" and the acquisition of the '098 Patent.  GrafTech is also a producer of carbon foam.  GrafTech holds itself out as one of the leading manufacturers of carbon and graphite products for industrial applications.  GrafTech manufactures its products on four continents which it sells in over 70 countries around the globe.

Mr. Schuler visited Touchstone in West Virginia and, subsequently, Touchstone representatives met with GrafTech and UCAR representatives in Cleveland, Ohio. Touchstone rejected the unsolicited approach by Mr. Schuler involving acquisition of the '098 Patent.  (Doc. 19, Gregg Rosen Declaration, ¶ 2, hereinafter "Rosen Dec.").

UCAR then sought to obtain a license from Touchstone for use of the '098 Patent.  According to the record evidence, the parties spent the bulk of 2006 in unsuccessful negotiations over a license for the '098 Patent.  (Rosen Dec. ¶¶ 4-22). The parties traded Term Sheets for a proposed license of the '098 Patent via email, with UCAR submitting Term Sheets twice in February and again in June, and Touchstone submitting a Term Sheet to UCAR in March.  After Touchstone's March Term Sheet submission, UCAR counsel James Cartiglia suggested an in-person meeting in

3

Cleveland, Ohio, while Touchstone's counsel suggested a meeting in Triadelphia, West Virginia. Counsel and parties compromised by meeting at the Hampton Inn located in Canfield, Ohio, midway between Cleveland and Triadelphia. In the course of the meeting, Touchstone expressly related to UCAR the four reasons for its decision not to license the '098 Patent. (Rosen Dec. ¶ 12).

According to the record, on 10 May 2006, UCAR counsel provided a summary of UCAR's marketing plan and requested a resumption of licensing discussions over the '98 Patent. In its marketing plan summary, UCAR represented that it "has 12 employees 100% devoted to the technical and commercial development of carbon foam in the tooling area (not including manufacturing personnel). The areas of focus are R&D, marketing, sales, and business management." In addition, the summary marketing plan submitted by UCAR noted they were "collaborating with a global company that currently markets products and services for the composite tooling industry. This company is an expert at providing technical and commercial solutions in composite tooling. They will collaborate with us on selling GRAFOAM for tooling as well as develop new tooling solutions." (Rosen Dec., Ex. E).

Subsequent to the March meeting in Canfield, Ohio, UCAR's counsel continued to forward proposed license agreements to Touchstone. In September 2006, Touchstone's attorney, Mr. Rosen, emailed a memorandum detailing the parties' differences. (Rosen Dec., Ex. H). UCAR responded with a "revised draft" license agreement. (Rosen Dec., Ex. I). In addition, at the time UCAR counsel Mr. Cartiglia revised the draft license agreement in August, he also stated, in the accompanying email, that UCAR should not be responsible for any royalties retroactively because

4

"UCAR has to date not made any sales of carbon foam for composite tooling and, as such, should not be liable for any royalties or other payments under the agreement." (Rosen Dec., Ex. G).  The record indicates that this 14 August 2006 email from Mr. Cartiglia was consonant with his 25 July 2006 email to Mr. Rosen.  In that email, Mr. Cartiglia responded to Mr Rosen's question of whether GrafTech or UCAR had already sold carbon foam for composite tooling, by noting succinctly that "UCAR has not made any sales of carbon foam for composite tooling to date."  (Rosen Dec., Exs. N, O).

On 8 December 2006, UCAR's counsel Mr. Cartiglia sent Touchstone both a draft license agreement and a letter.  In the letter Mr. Cartiglia notes:

> Given the fact that all open issues expressed by Touchstone have been addressed, and that neither you nor Touchstone has responded to messages for over two months, we can only conclude that Touchstone has not been negotiating in good faith, and has been simply trying to interfere with UCAR's competitive activities.  As such, unless Touchstone executes the most recent draft license agreement by December 18, UCAR withdraws its offer to license the Touchstone composite tooling intellectual property. . . .
>
> In addition, as Touchstone is undoubtedly aware, the independent claim of the '098 patent is invalid, and is not infringed by anything UCAR is doing, and UCAR will continue to act accordingly.

(Rosen Dec., Ex. J).  In his letter response of 13 December 2006 Touchstone attorney Mr. Rosen noted that UCAR had not heard from the defendants since the end of September because the company was "re-evaluating its business strategy."  Mr. Rosen further responded:

> As far as your conclusion that Touchstone has not been negotiating in good faith and simply has been trying to interfere with UCAR's competitive activities, nothing could be further from the truth and Touchstone categorically denies the assertion.  Touchstone has precious little knowledge of UCAR's competitive activities.  Indeed, UCAR made a point of sharing nothing about its business activities, plans or strategies in

5

relation to the use of carbon foam for composite tooling with Touchstone. The information vacuum surrounding UCAR's competitive activities created by GrafTech and/or UCAR is an important basis for Touchstone's decision to put further negotiations with GrafTech on hold.

Insofar as your assertion that "the independent claim of the '098 patent is invalid, and is not infringed by anything UCAR is doing", Touchstone disagrees that any of the claims in the patent referred to above are invalid. Furthermore, and as explained above, Touchstone has no information, other than what is available on GrafTech's website and that which it displays at trade shows, about what, if anything, UCAR is doing in relation to the use of carbon foam for composite tooling.  While I can understand GrafTech's disappointment stemming from Touchstone's decision not to consummate a license agreement at this time, Touchstone is disappointed by GrafTech's veiled threats which you have made on its behalf in your December 8, 2006 letter.

(Rosen Dec., Ex. K).

Following this exchange, according to the record, Touchstone's attorney Mr. Rosen next heard from UCAR by letter on 31 January 2007, announcing UCAR's filing of a complaint with the United States Federal District Court, Northern District of Ohio asking for a declaratory judgment that Touchstone's '098 patent was invalid and that UCAR was not infringing the '098 patent.  UCAR further asked the Court for a declaratory judgment enforcing a license between UCAR and Touchstone.  (Rosen Dec., Ex. L, Wiedemann Letter).  The Wiedemann letter did not serve the complaint on Touchstone, explaining "[i]t is UCAR's sincere desire to resolve this matter without litigation.  To that end UCAR requests a meeting with Touchstone to discuss the issues identified in the Complaint.  While UCAR would prefer to resolve these issues by execution of the License Agreement between the parties . . . UCAR is prepared to go forward with the litigation should that be necessary."  Id.

6

UCAR specifically noted it would withhold serving the complaint on Touchstone until it heard whether Touchstone would be willing to meet to discuss the '098 Patent. Touchstone counsel Mr. Rosen and UCAR counsel Mr. Wiedemann arranged a meeting between the two companies for 26 February 2007 in Pittsburgh, Pennsylvania. According to Mr. Rosen, on 23 February he received an email from Mr. Wiedemann explaining that UCAR expected to leave the scheduled Pittsburgh meeting with a "fully executed license agreement."  (Rosen Dec. ¶ 24).  When informed by phone that "UCAR's expectations [were] unrealistic" Mr. Wiedemann told Mr. Rosen that UCAR would not attend the 26 February 2007 meeting.  Id.

UCAR served its complaint on Touchstone on 27 February 2007 seeking a declaratory judgment that the '098 patent is invalid and, alternatively, seeking a declaratory judgment that Touchstone was estopped from denying it had granted a license in the '098 patent to UCAR.

## II. DISMISSAL

In Count I of its complaint, UCAR seeks a declaratory judgment of non-infringement and invalidity from this Court regarding the '098 Patent.  UCAR seeks patent-specific rulings that it does not infringe the '098 Patent, and to find the '098 Patent invalid.  Touchstone asks the Court to dismiss Count I for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), because it is lacking an actual controversy.  See 28 U.S.C. § 2201(a).[2]

---

[2]The Declaratory Judgment Act provides:
In a case of actual controversy within its jurisdiction ... any court of the

7

In the context of a declaratory judgment action, this Circuit has recognized, in

Sankyo Corp. V. Nakamura Trading Corp. 129 Fed. Appx. 648, 650 (6th Cir. 2005), that

the basic inquiry is whether:

> the conflicting contentions of the parties ... present a real, substantial
> controversy between the parties having adverse legal interests, a dispute
> definite and concrete, not hypothetical or abstract.

Babbitt v. Farm Workers Nat'l Union, 442 U.S. 289, 297-98 (1979).  This jurisdictional

prerequisite is firmly rooted in the United States Constitution which provides, in pertinent

part, that "[t]he judicial power shall extend to all Cases, in Law and Equity, arising under

this Constitution, the Laws of the United States, and Treaties ... [and] to

Controversies...."  U.S. Const., Art. III, sec. 2, cl. 1.  This case or controversy

requirement prevents federal courts from rendering advisory opinions or considering

hypothetical or abstract questions.  Hall v. Beals, 396 U.S. 45, 48 (1969).

To meet the jurisdictional requirements of Article III's "case" or "controversy"

requirement, "a plaintiff must, generally speaking, demonstrate that he [or she] has

suffered 'injury in fact,' that is 'fairly traceable' to the actions of the defendant, and that

the injury will likely be redressed by a favorable decision."  Bennett v. Spear, 520 U.S.

154, 162 (1997).  The Supreme Court has clearly identified what qualifies as injury in

fact: "[W]e have said many times before and reiterate today: Allegations of possible

---

> United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201.  The Declaratory Judgment Act is not an independent basis for
subject matter jurisdiction.  Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667,
671-72 (1950).  Rather, it provides a remedy available only if the court has jurisdiction
from some other source.  Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 879 (Fed.
Cir.2008)

8

future injury do not satisfy the requirements of Art. III.  A threatened injury must be 'certainly impending' to constitute injury in fact."  Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) ;  Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville and Davidson County, Tennessee, 274 F.3d 377, 399 (6th Cir.2001) ("Ripeness requires that the 'injury in fact be certainly impending.'"); see also MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126-27, 127 S.Ct. 764 (2007) (concluding that declaratory judgment jurisdiction was proper in the context of a patent licensing agreement when the patentee claimed a right to royalties under the licensing agreement, and the licensee asserted that no royalties were owing because the patent was invalid and not infringed).

In overruling the Federal Circuit's "reasonable apprehension of suit" test for determining subject matter jurisdiction in declaratory judgment actions, the recent decision in MedImmune reaffirmed that the proper test for subject matter jurisdiction in declaratory judgment actions is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. at 771.  While MedImmune reiterates the proper test for subject matter jurisdiction, the facts of that case which resulted in a finding of an actual controversy, are inapplicable here.  In MedImmune, the parties were already joined in a contractual relationship over the disputed patent.  The declaratory judgment action addressed contract interpretation and was markedly different from the facts of the present action.

While the MedImmune standard may be analyzed directly, the Supreme Court has also developed various more specific but overlapping doctrines rooted in the same Article III inquiry, which must be met for a controversy to be justiciable, including

9

standing, ripeness, and a lack of mootness.  See Caraco Pharmaceutical Laboratories,

Ltd. v. Forest Laboratories, Inc., 527 F.3d 1278, 1291 (Fed. Cir. 2008) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560 (1992) (standing); Abbott Labs. v. Gardner,

387 U.S. 136, 149 (1967) (ripeness); and U.S. Parole Comm'n v. Geraghty, 445 U.S.

388 (1980) (mootness)).  As satisfying these doctrines represents the absolute

constitutional minimum for a justiciable controversy, they can be a helpful guide in

applying the all-the-circumstances test reiterated in MedImmune.

Here, the Court finds no case or controversy where there is no definite and

concrete dispute that touches the legal relations of the parties.  Considering the totality

of the circumstances, UCAR has not alleged a controversy of sufficient "immediacy and

reality" to create a justiciable controversy. This "immediacy and reality" inquiry can be

viewed through the lens of standing.  To satisfy standing, the plaintiff must allege (1) an

injury-in-fact, i.e., a harm that is " 'concrete' and actual or imminent, not 'conjectural' or

'hypothetical,'" (2) that is "fairly traceable" to the defendant's conduct, and (3)

redressable by a favorable decision.  Caraco, 527 F.3d at 1291 (quoting Steel Co. v.

Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998)); see also DaimlerChrysler Corp.

v. Cuno, 547 U.S. 332, 342 (2006).  Absent an injury-in-fact fairly traceable to the

patentee, there can be no immediate and real controversy.

Taking all the facts into account, UCAR has not met this threshold burden of

proving an immediate and real controversy.  Important to the totality of the

circumstances analysis in the instant case is that which has not occurred.  Generally,

the Supreme Court has affirmed declaratory judgment jurisdiction when "the parties had

taken adverse positions with regard to their obligations, each side presenting a concrete

10

claim of a specific right" prior to the suit.  <u>SanDisk Corp. v. STMicroelectronics, Inc.</u>, 480

F.3d 1372, 1379 (Fed. Cir. 2007) (<u>citing</u> <u>Aetna Life Ins. Co. of Hartford, Conn. v.</u>

<u>Haworth</u>, 300 U.S. 227, 240-41, 57 S.Ct. 461); <u>see also</u> <u>MedImmune</u>, 127 S.Ct. at

772-77, 127 S.Ct. 764.

In contrast, here Touchstone has not accused UCAR of infringement or asserted

any rights in the '098 Patent over-against UCAR, nor have they taken any actions which

imply such claims.  Instead, all the Court has before it is a complaint asking, in Count I,

for a declaratory judgment predicated on UCAR's allegation that its product does not

infringe the '098 patent.  The record reflects UCAR's consistent representation that,

while it sought an exclusive license for the '098 Patent, it was not engaged in the sale of

carbon foam for composite tooling.  Touchstone's reasonable response to UCAR's

representation was not to communicate a position on its '098 Patent with regard to any

identified UCAR product or activity because UCAR represented it had no product or

activity which fell within the ambit of the '098 Patent.

The record further reflects that Touchstone did not claim a specific right against

UCAR and did not threaten to bring a claim against UCAR, but at most wrestled over

whether entering into a licensing agreement with UCAR over the '098 Patent

represented a viable economic strategy for the company, a point which Touchstone

admits it was reevaluating at the time of UCAR's filed complaint.  The defendant's lack

of any "concrete claim of a specific right" weighs against a finding of an actual

controversy, particularly given that there has been no actual injury.  The lack of any

evidence that Touchstone believed or planned to assert that UCAR's products infringed

their patent creates a high barrier to proving that UCAR faces an imminent risk of injury.

11

Moreover, not only has Touchstone not taken a concrete position adverse to UCAR's, but it also has taken no affirmative actions at all related to UCAR's current product.

Because Count I of the Complaint does not present an Article III case or controversy, under the standard affirmed in MedImmune, it will be dismissed for lack of subject matter jurisdiction.

### III.  UCAR'S CLAIMS FOR EQUITABLE AND LEGAL ESTOPPEL

Touchstone asks the Court to dismiss, for failure to state a claim or through summary judgment, UCAR's claim for a declaratory judgment of equitable estoppel (Count II), and its claim for a declaratory judgment of legal estoppel (Count III).  Under its equitable estoppel claim, UCAR maintains that Touchstone's conduct led UCAR to reasonably believe it had a license to use the '098 patent in exchange for a 5% royalty payment on a sliding scale and asks the Court to find that Touchstone may not assert otherwise.  (Doc. 26, pp. 17–25).  In its legal estoppel claim, UCAR further maintains that the parties had "agreed to enter into a license agreement" in early 2006 for which Touchstone received consideration at least in the form of "UCAR's promise to pay royalties based on sales of carbonaceous foam, and UCAR's building of the market for carbonaceous foam for use in tooling applications."  (Doc. 26, 25-28).

Taking up, first, the question of legal estoppel, the court in AMP, Inc. v. United States, 389 F.2d 448, 452 (Court of Claims 1968), explains:

> The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor . . .  has licensed . . .  a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped

> from taking back in any extent that for which he [or she] has already
> received consideration.

As such, the Court looks to find, in the record, whether Touchstone licensed or assigned its right to the '098 Patent and whether it received valuable consideration in return. Reviewing the record, the Court finds no express agreement which might form the factual predicate for a claim of legal estoppel.

It is axiomatic that contract formation requires objective manifestations of intent as expressed in the contractual documents.  See Bagsby v. Lewis Brothers, Inc., 820 F.2d 799, 803 (6th Cir. 1987).   None of the documents involved in this matter show an express intent to contract.  On their face, the draft term sheets circulated by the parties in early 2006, the period expressly referenced in UCAR's complaint (Complaint ¶28), contained a Binding Agreement Disclaimer, expressly noting:

> This Memorandum of Terms has been prepared for discussion purposes
> only and is not intended to be a binding agreement or to evidence any
> binding obligations.  The completion of the transaction contemplated by
> this Memorandum of Terms will be subject to, among other things,
> satisfactory negotiations and execution of definitive documents acceptable
> to both parties.

(Rosen Dec., Ex. A).  UCAR's 29 June 2006 circulation of a "License Agreement" was expressly termed a "proposed" agreement and incorporated the parties' latest terms sheet, which included the Binding Agreement Disclaimer.  (Rosen Dec., Ex. F).  UCAR's 28 September 2006 circulation of a modified "License Agreement" was later referred to by UCAR, on 8 December 2006, as a "draft license agreement" which the plaintiff was prepared to withdraw unless Touchstone executed that draft license agreement by 18 December 2006.  (Rosen Decl., Exs. I, J).

13

UCAR's reliance upon <u>Arnold Palmer Golf Co. V. Fuqua Indus., Inc.</u>, 541 F.2d 584 (6th Cir. 1976) in support of its argument for legal estoppel indicates the importance of objective contractual documents. The "memorandum of intent" signaling a joint venture between the parties in <u>Arnold</u> is clearly absent in this instance, and the Court, here, finds the presence of no objective equivalent.

Accordingly, as a matter of law, the Court will dismiss UCAR's legal estoppel claim.

As to the question of equitable estoppel, the Court in <u>A.C. Aukerman Co. v. R.L. Chaides Const. Co.</u>, 960 F.2d 1020, 1028 (Fed. Cir. 1992), laid out the three elements required to establish equitable estoppel as a bar to a patentee's suit, used in this instance by UCAR in seeking a declaratory judgment from the Court:

> a. The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.
>
> b. The alleged infringer relies on that conduct.
>
> c. Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

In this instance, UCAR's Complaint expressly alleges the necessary elements to survive Touchstone's Rule 12(b)(6) challenge. (Complaint, ¶¶ 57-59).

Further, reviewing the record and drawing all inferences in the light most favorable to UCAR, the Court finds the existence of genuine issues of fact that prevents the dismissal of UCAR's declaratory judgment equitable estoppel claim through summary judgment, at this early juncture of the proceedings. The parties' term sheets indicate an effort to reach a mutually satisfying agreement, but from the vantage of

hindsight, each party has reached different conclusions regarding intent, expectations and reliance. For example, questions arise as to whether UCAR could reasonably infer that the main purpose of the March 2006 meeting in Canfield, Ohio with Touchstone was to negotiate the royalty rate for the license agreement for the '098 Patent or whether Touchstone expressly declined UCAR's license agreement proposal. Questions also arise concerning Touchstone's 9 June 2006 encouraging email, as well as Touchstone's reception of UCAR's May 2006 submission of the "GRAFOAM Marketing Plan," which described the resources UCAR was investing in the carbon foam tooling market. Finally, UCAR disagrees with Touchstone's inference regarding UCAR's 8 December 2006 letter, that the plaintiff was withdrawing its offer, insisting instead that the letter was meant "to prompt Touchstone's execution of the finalized agreement." These differences, held in hindsight by UCAR, may ultimately have no basis in reason, but at this early juncture of the proceedings they appear as material differences requiring further inquiry.

Accordingly, the Court will deny Touchstone's request to dismiss through summary judgment UCAR's claim for a declaratory judgment of equitable estoppel.


## IV. <u>TRANSFER OF VENUE PURSUANT TO 28 U.S.C. § 1404</u>

Touchstone alternatively moves for a transfer of venue pursuant to 28 U.S.C. § 1404(a), on the grounds that UCAR's declaratory judgment action, removed to this court, represents an improper anticipatory filing. UCAR has urged this court to retain venue in the Northern District of Ohio because its declaratory judgment action does not

15

constitute forum shopping.  For the following reasons, the Court will grant Touchstone's motion to transfer the remaining claim in this matter.


### A.  Authority to Transfer Venue and Burden of Proof

In allowing for a transfer of venue, 28 U.S.C. § 1404(a)  provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  "Under 28 U.S.C. § 1404(a), a district court 'has broad discretion to grant or deny a motion to transfer [a] case.'"  Phelps v. McClellan, 30 F.3d 658, 663 (6th Cir. 1994)(quoting Cote v. Wadel, 796 F.2d 981, 985 (7th Cir. 1986)).

Before deciding whether or not the "convenience of the parties and witnesses" and "the interest of justice" reasonably support a transfer, courts first determine whether the proposed alternative venues are "district[s] or division[s] where [the action might] have been brought."  28 U.S.C. § 1404(a);   Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29-30 (1988).

This requires the Court to first ask (1) whether the court in the District of West Virginia could exercise original jurisdiction over the case; (2) whether that court would have personal jurisdiction of the defendants; and (3) whether venue would be proper in that court.  See Jamhour v. Scottsdale Insurance Co., 211 F. Supp.2d 941, 945 (S.D. Ohio 2002).

The moving party bears the burden of proving why a court should grant a transfer.  Picker Intern., Inc. v. Travelers Indem. Co., 35 F.Supp.2d 570, 573 (N.D. Ohio 1998).

.

**B.  Transfer Factors**

This Court considers several factors in weighing a motion to transfer pursuant to § 1404(a), such as "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" Moses v. Business Card Express, Inc., 929 F.2d 1131, 1137 (6th Cir. 1991);  see also Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30 (1988).  These private interests include the plaintiff's choice of forum, location of documents, convenience of witnesses, possibility of prejudice in either forum, and the practical problems associated with trying the case expeditiously and inexpensively.  In weighing these private interest factors, the Court should consider whether the plaintiff chose an inconvenient forum to vex or harass the defendant "by inflicting upon him [or her] expense or trouble not necessary to his [or her] own right to pursue his [or her] remedy."   Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).

Factors to be weighed in considering the public interest include docket congestion, the burden a trial would have on a jurisdiction with no connection to the litigation, and the familiarity of the court with the controlling law.  Id.

Once a court analyses these factors, exercise of the court's discretion to transfer is proper if fairness and practicality favor the forum to which transfer is sought.  Mead Data Central Inc. v. West Pub. Co., 679 F. Supp. 1455, 1457 (S.D. Ohio 1987).

**C. Balance of transfer "strongly in favor" of transfer.**

In this Circuit, Gulf Oil has been cited for the proposition that a case should not be transferred unless the balance is "strongly in favor" of the party seeking the transfer. See Nicol v. Koscinski, 188 F.2d 537 (6th Cir. 1951).  However, court opinions indicate the balance need not be "strongly in favor" of the party seeking the transfer, but rather need only favor the party seeking the transfer.

The "'strong showing' standard has its roots in cases that treated Section 1404(a) as a mere codification of the doctrine of forum non conveniens. . . "  But in 1955, the Supreme Court held that the intent of Congress in enacting section 1404(a) was not merely to codify that doctrine, but to "permit courts to grant transfers upon a lesser showing of inconvenience."  Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955).  That decision casts considerable doubt on the proposition that the statute requires a strong showing to overcome the plaintiff's choice of forum.

Although the Sixth Circuit has held that a request for transfer pursuant to Section 1404(a) should not be granted unless the balance of convenience is strongly in favor of the defendant, Nicol v. Koscinski, supra, Nicol is one of the pre-Norwood cases that applied the "strong showing" standard because of its applicability in cases involving forum non conveniens and is not grounded in the language of the statute or in the holding of Norwood.  See Roberts Metals, Inc. v. Florida Properties Mktg. Group. Inc., 138 F.R.D. 89, 92-93 (N.D. Ohio 1991).

In Norwood, the Supreme Court adopted language set forth in a court of appeals decision which further illustrates that a "strong showing" is no longer required:

18

>The notion that 28 U.S.C.A. § 1404(a) was a mere codification of existing law relating to forum non conveniens is erroneous. It is perfectly clear that the purpose of this section of the Revised Judicial Code was to grant broadly the power of transfer for the convenience of parties and witnesses, in the interest of justice, whether dismissal under the doctrine of forum non conveniens would have been appropriate or not.

Norwood, 349 U.S. at 31-32 (quoting Jiffy Lubricator Co., Inc. v. Stewart-Warner Corp., 177 F.2d 360, 362 (4th Cir. 1949), cert. denied, 338 U.S. 947 (1950)) (emphasis added).

The Norwood Court went on to say that "we believe that Congress, by the term 'for the convenience of the parties and witnesses, in the interest of justice,' intended to permit courts to grant transfers upon a lesser showing of inconvenience."  Norwood, 349 U.S. at 32.  Statements made by the dissenting Justices in Norwood indicate that they read the majority opinion as effectively eliminating the "strong showing" requirement.  See Norwood, 349 U.S. at 40.

The Court therefore concludes that it is appropriate to apply a preponderance standard to the Section 1404(a) analysis.  See Gdovin v. Catawba Rental Co., 596 F. Supp. 1325, 1326 & n. 1 (N.D. Ohio 1984) (applying a preponderance test on a motion to transfer).  That is, the movant must show that the "forum to which he [or she] desires to transfer the litigation is the more convenient one vis-a-vis the plaintiff's initial choice." Mead Corp., 508 F.Supp. at 198.  Thus, the balance need not be "strongly in favor" of the party seeking transfer; however, the moving party still bears the burden of proof that transfer would be for the convenience of both the parties and the witnesses and is in the interest of justice.

Furthermore, while a plaintiff's choice of forum is ordinarily entitled to some deference, it should carry less weight in a declaratory judgment action.  "A plaintiff

19

brings such an action because it has perceived a threat of suit.  Therefore, its posture

before the court is more akin to a defendant than an ordinary plaintiff seeking relief."

Societe Generale v. Florida Health Sciences Center, Inc., 2003 WL 22852656 at *7

(S.D.N.Y. 2003).[3]

In resolving this issue the Court usually engages in a two-part inquiry.   Because

the first part of the inquiry – whether the action "might have been brought" in the

Northern District of West Virginia – is already clear, this Court turns to the second part

of the inquiry – whether the proposed change of venue would facilitate the "convenience

of the parties and witnesses" and serve "the interests of justice." Rutherford v. Good

Year Tire and Rubber Co., 943 F.Supp. 789, 791 (W.D. Ky. 1996), aff'd, 142 F.3d 436

(6th Cir. 1998).

An analysis of factors relevant to this case demonstrates that transfer to the

Northern District of West Virginia, pursuant to Section 1404(a), is appropriate.

1.      Plaintiff's Choice of Forum

In general, a plaintiff's choice of forum should be given "weight" when deciding

whether to grant a motion to change venue though such choice is not dispositive.  Lewis

---

[3]The posture toward declaratory judgment actions is consonant with the courts'
posture toward the first-to-file rule in matters of equity.  Factors that weigh against
enforcement of the first-to-file rule include extraordinary circumstances, inequitable
conduct, bad faith, anticipatory suits, and forum shopping.  See Alltrade, Inc. v. Uniweld
Prods., Inc., 946 F.2d 622, 628 (9th Cir.1991).   The Sixth Circuit recognizes that a
district court may decline to invoke the first-to-file rule for reasons of equity.  Zide Sport
Shop of Ohio, Inc. v. Ed Tobergte Associates, Inc., 2001 WL 897452 at *3 (6th July 31,
2001) (district courts have discretion to dispense with first-to-file rule where equity so
demands).  The court has the discretion to find an exception to the first-filed rule if
circumstances suggest bad faith, a merely anticipatory suit or forum shopping.  Plating
Res., Inc. v. UTI Corp., 47 F.Supp.2d at 903.

20

v. ACB Business Services, Inc., 135 F.3d 389, 413 (6th Cir. 1998).  While courts have variously described the amount of weight such a choice should be afforded, see e.g Picker, 35 F. Supp. 2d at 573 ("great weight");  U.S. v. Cinemark USA, Inc., 66 F. Supp. 2d 881 (N.D. Ohio 1999) ("substantial weight");  International Union, U.A.W. v. Aluminum Co. of America, 875 F. Supp. 430, 433 (N.D. Ohio 1991) (concluding that while "plaintiffs' choice of forum is to be awarded some weight, it is not of paramount importance; it is instead one factor to be weighed equally with other relevant factors"), this Court finds that, under the circumstances of this case, no weight should be given to UCAR's choice of forum but, to the contrary, considers plaintiff's action impermissibly peremptory.

As explained in Cinemark, the "rationale for giving a plaintiff's choice of forum 'substantial weight'–as opposed to equal or little weight–is that, unlike defendant forum shopping, plaintiff forum shopping 'is not an evil to be avoided, but rather is an inherent part of our federal network'" and this flexibility "encourages them to use the judicial system for their disputes."  66 F. Supp. 2d at 889.  This rationale, however, is diminished, if not wholly absent, in certain cases such as where that election resulted from a "race to the courthouse."  Veryfine Products, Inc. v. Phlo Co., 124 F. Supp. 2d 16 (D. Mass. 2000) (concluding that, in certain cases, the winner of the "race to the courthouse should not enjoy the presumption of preferable venue");  see also Alexander Ins. Ltd. v. Executive Life Ins. Co. of New York, 1991 WL 150224, *2 (S.D. N.Y., July 29, 1991).

In this case, the parties were engaged in licensing discussions, initiated by the plaintiff, regarding the '098 Patent.  The specter of litigation arose only when

21

Touchstone made the business decision not to entertain licensing options for the '098 Patent under the terms offered by UCAR and Graftech.  The record betrays no evidence that Touchstone considered litigation on this issue.  In this context, it makes little sense to afford any weight to UCAR's and Graftech's anticipatory filing.  That filing not only occurred on the heels of licensing negotiations between the parties, but the filing itself was accompanied by enticements signaling the plaintiff's intent to forego litigation if Touchstone tendered a license on its '098 Patent to UCAR, pursuant to UCAR's terms.  Indeed, under these circumstances, UCAR's anticipatory filing of its declaratory action is considered prohibited procedural fencing that undermines the interests of justice.

Accordingly, this Court finds that this factor weighs against UCAR.

2.      Convenience of the Parties and Witnesses

Convenience of the parties and the witnesses are important factors to weigh in the balance, as both are explicitly mentioned as considerations in Section 1404(a).  Picker, 35 F. Supp. 2d at 573.  With respect to convenience to the witnesses, the Court must consider the nature of each witness and the materiality of their anticipated testimony, not merely the number of prospective witnesses in each district.  Royal & Sunalliance v. British Airways, 167 F. Supp. 2d 573, 577 (S.D. N.Y. 2001); 15 WRIGHT & MILLER, Federal Practice and Procedure § 3851.

In this instance, the convenience of the witnesses and parties weigh in favor of transferring venue to the Northern District of West Virginia.  The record indicates that Touchstone, a closely held company of fifty employees, may well require the testimony of key management personnel, including the president, the program manager for

22

carbonaceous foam, and the chief financial officer, to assemble the facts regarding UCAR's remaining estoppel claim.

Further, the Court notes these key Touchstone employees must take time to address the equitable estoppel claim, which may be imposed in a patent case when a patentee is found to have wrongly induced another party to believe that it will not sue that party for operating as though it had a license agreement.  See Forest Laboratories, Inc. v. Abbott Laboratories, 339 F.3d 1324 (Fed. Cir. 2003) (finding such business conduct unexceptional and concluding that defendant's "equitable estoppel" conduct was not an appropriate basis for awarding attorney fees under § 285, reversing the district court's decision).  Accordingly, under the current legal landscape, Touchstone must devote a number of employee hours to address UCAR's affirmative defense of equitable estoppel.  Given the constellation of events indicated in the record, the Court finds it difficult to conclude that UCAR's cause of action arose out of Touchstone's Ohio transactions.  As such, in this instance, the focal point of the claim is the locus of the patent itself for which UCAR seeks to bar an argument that it does not have a license.

Moreover, the Court remains unconvinced that UCAR's ties to Ohio outweigh the convenience, and thus the case in general, of a transfer of this matter to West Virginia. The situs of the records, the manufacturing of the carbonaceous foam, and the genesis of the patent itself, over which UCAR brings its request for declaratory judgment, all center on Triadelphia, West Virginia.  (Joseph Dec. ¶6, 9).  The Court does not find that UCAR has an equivalent orientation to Ohio.  While UCAR is headquartered in Ohio, the plaintiff is wholly owned by GrafTech, which together have manufacturing facilities in

23

several states and countries, including a manufacturing facility in Clarksburg, West Virginia.

        3.        <u>Location of Documents</u>

"While the location of evidence is generally a relevant factor in the § 1404 analysis, the location of documentary evidence is a minor consideration," given the ease with which it can be transferred between locations.  <u>Picker</u>, 35 F. Supp. 2d at 574; <u>see also</u> <u>Cinemark</u>, 66 F. Supp. 2d at 890.  Given that this case appears to principally involve documentary evidence and that these documents are interspersed between West Virginia and Ohio, this factor does not weigh in either party's favor.

        4.        <u>Public and Practical Considerations</u>

The relevant factors to be considered regarding the public's interests include: docket congestion; the burden of trial to a jurisdiction with no relation to the cause of action; the value of holding trial in a community where the public affected live; the familiarity of the court with controlling law; judicial economy and the avoidance of inconsistent judgments.

Evidence suggests the Northern District of West Virginia's civil docket may be slightly less congested than the civil docket in the Northern District of Ohio.  However, given the nature of the claim and the relative posture of the parties, the Court concludes the public considerations do not heavily favor either party.

24

## V.  CONCLUSION

Touchstone's motion to dismiss UCAR's action is granted as to Counts I and III, and denied as to Count II.  Further, Touchstone's motion to transfer pursuant to 28 U.S.C. 1404(a) is granted.  This transfer moots UCAR's pending motion for oral argument.  (Doc. 37).  Accordingly, this case is hereby transferred to the Northern District of West Virginia for further proceedings on Count II of the Complaint.


IT IS SO ORDERED.


   /s/Lesley Wells
UNITED STATES DISTRICT JUDGE


Date: 6 January 2009